IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


BRANDON EUGENE LACY                                                    PLAINTIFF

        v.                              Civil No. 07-5200

SHERIFF KEITH FERGUSON;
CAPTAIN HUNTER PETRAY; ET AL.                                         DEFENDANTS


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Brandon Eugene Lacy brings this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. While he was an inmate of the Benton County Detention Center, Lacy contends his constitutional rights were violated when he was incarcerated under conditions posing a substantial risk of serious harm.

Defendants filed a motion for summary judgment (Doc. 18). Lacy filed a response to the motion (Doc. 31). However, I believed further information was needed. For this reason, I entered an order (Doc. 32), directing Lacy to complete, sign, and return an attached questionnaire that would serve to provide the court additional information in response to the summary judgment motion. Lacy filed a timely response to the court's questionnaire (Doc. 37). The case is currently before the undersigned for the issuance of a report and recommendation on the summary judgment motion.

## I. BACKGROUND

Lacy was booked into the Benton County Detention Center (BCDC) on September 2, 2007, on a charge of public intoxication. *Plaintiff's Response* (Doc. 37)(hereinafter *Resp.*) at ¶

-1-

1(A).  On September 3rd, while he was in the BCDC, he was arrested and charged with capital

murder.  *Id.* at ¶ 1(B).

On September 6th at approximately 9:10 a.m., Deputy Reeves saw Lacy get off the

ground and start to walk around the tables.  *Resp.* at ¶ 4(A).  Reeves escorted Lacy to pod control

while Deputy Hernandez escorted Mark Teas.  *Id.* at ¶ 4(B).  Lacy was instructed to get on his

knees and face the wall.  *Id.*

According to Reeves, Lacy stated he had been reading the newspaper when someone

came up behind him and sucker-punched him.  *Resp.* at ¶ 4(C).  Lacy indicated he didn't know

who it was and just grabbed the closest person to him who happened to be Teas.  *Id.*

According to Reeves' report, Teas stated he was walking to his seat when Lacy fell on the

ground and grabbed his leg.  *Defts' Ex.* 3 at page 2.  Teas said he panicked and shook Lacy off

his leg.  *Id.*

Corporal Bryson was called to D-pod by Hernandez and informed Lacy had been hit in

the eye.  *Resp.* at ¶ 2.  Lacy told Bryson he didn't know what happened.  *Id.* at ¶ 3(A).  He stated

he had been sitting at a table reading the newspaper and the next thing he knew he was on the

floor.  *Id.*

Bryson questioned Teas.  *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 3 at page 1.  Teas

stated that he was walking to another table when Lacy grabbed his leg.  *Id.*  Teas stated he tried

to help Lacy up.  *Id.*

According to Bryson, he asked Lacy if he had any problems with any other inmates in D-

130.  *Defts' Ex.* 3 at page 1.  Bryson indicates Lacy replied:  "No, I'm in here for a long time I

-2-

have nothing to lose." *Id.* Bryson questioned other inmates and they told him they didn't see anything. *Id.*

According to Lacy, he stated he didn't know why he had been struck in the first place. *Resp.* at ¶ 3(C). Lacy states he said if Teas was the one who hit him, he thought he would be fine if they moved Teas. *Id.*

Bryson asked Lacy if he needed medical attention and he replied: "No, I am fine." *Resp.* at ¶ 3(E). Bryson indicates he asked Lacy if he felt his life was in danger and Lacy responded: "No." *Defts' Ex.* 3 at page 1. Lacy maintains he was never asked if his life was in danger. *Resp.* at ¶ 3(F).

Bryson indicates he then let Lacy and Teas back into D-130 and returned to his duties. *Defts' Ex.* 3 at page 1. Lacy, however, states Bryson let him back into D-130 and walked down the hall with Teas. *Resp.* at ¶ 3(G). Lacy thought Bryson was moving Teas but after five minutes Teas came back into D-130. *Id.*

At 4:50 p.m. on September 6, 2007, Deputy Finnegan was doing a cell search in D-130 cell 210 when he heard the inmates as a whole get loud and begin cheering. *Defts' Ex.* 3 at page 5. He stepped out of the cell and saw Lacy getting punched by Inmate Bretado-Patino. *Id.*

Finnegan called for assistance. *Defts' Ex.* 3 at page 5. He saw Lacy throw an unsuccessful punch and then fall to the ground. *Id.* Finnegan saw an unidentified male inmate throw a punch at Bretado-Patino. *Id.* Finnegan ordered all inmates to get on the ground. *Id.* All complied. *Id.*

AO72A
(Rev. 8/82)

According to Lacy, he was hit in the back of the head and went straight to the ground. *Resp.* at ¶ 5(B). Lacy also indicates the inmates did not get down until other deputies came to D-130. *Id.* at ¶ 5(C). Lacy sates he was kicked many times while he was down. *Id.*

Bretado-Patino was taken to pod control and asked why he was fighting. *Defts' Ex.* 3 at page 5. He replied: "I don't understand you." *Id.*

Lacy was taken to pod control and ordered to his knees and told to face the wall. *Defts' Ex.* 3 at page 5. According to Finnegan, when Lacy was asked why he was fighting, he replied: "It was me, I did it." *Id.* Lacy, however, maintains he replied: "It was not me who was fighting. I got jumped from behind." *Resp.* at ¶ 5(E).

Finnegan noticed Lacy was in extreme discomfort. *Resp.* at ¶ 5(F). He was escorted to the nurse's station and then to the emergency room where it was discovered he had a broken clavicle. *Id.*

According to Finnegan, he  interviewed Lacy later that evening and Lacy told him that he had been attacked from behind. *Defts' Ex.* 3 at page 5. Lacy stated he fell to the ground when attacked and his shoulder started to hurt. *Id.*

Lacy asserts that Bryson and Sgt. De La Garza are the only officers who came to talk to him when he returned from the hospital. *Resp.* at ¶ 5(G). Lacy indicates they were asking who jumped him. *Id.*

Sgt. De La Garza interviewed Pablo Martinez Torres. *Defts' Ex.* 3 at page 6. Torres stated that Lacy and Bretado had gotten into a fight and he had tried to separate them. *Id.* Torres originally agreed to write a statement about the fight but then changed his mind. *Id.*

When Lacy returned to the jail after being taken to the hospital he was placed in protective custody and housed in booking in the intake holding cell. *Resp.* at ¶ 7.  On September 29th Lacy submitted a grievance complaining that he was isolated from everyone and not allowed to take recreation with others or attend church. *Resp.* at ¶ 8(A).  He stated he got along with everyone in the pod. *Id.*

On October 3, 2007, Lacy again submitted a grievance complaining about being in a cell by himself. *Resp.* at ¶ 9(A).  He said he was going crazy because he was by himself all the time. *Id.*  In response, he was told he was on protective custody for his protection. *Id.*  Lacy indicates he never stated he no longer felt he was in danger. *Id.* at ¶ 9(B).  He just did not understand why he was housed alone "[b]ut was always around other inmates." *Id.*

On October 15th Lacy asked to be taken off protective custody (PC) to become a trustee. *Resp.* at ¶ 10.  In response, he was told he would remain where he was for now. *Id.*

On December 3, 2007, Lacy submitted a grievance requesting that if he was moved from his cell for any reason that there be a deputy there for his safety. *Resp.* at ¶ 11(A).  He said he had been threatened several times and believed he would be jumped or hurt. *Id.*  He said he was ok with people that were on PC. *Id.*

On December 8th Lacy submitted a grievance stating that he had been told that if someone messed up they would do more than break his collar bone this time. *Resp.* at ¶ 11(B).  He asked that he not be let out with anyone who was not on PC. *Id.*

On December 12th Lacy submitted a request about his safety. *Resp.* at ¶ 11(C).  He said he had submitted a grievance to keep him and Jose Luis Larado separated but that yesterday at

-5-

recreation time they opened Larado's door and his at the same time. *Id.* He asked that it not happen again. *Id.*

Lacy was asked when he submitted a request to be kept separate from Larado. *Resp.* at ¶ 11(D). He responded on December 3rd. *Id.* Lacy indicated he did not mention Larado's name because he was afraid of what Larado would do to him "for telling on him." *Id.* Lacy indicates Larado was not on PC. *Id.* By asking not to be around anyone not on PC, Lacy states he believed that would help. *Id.* On December 13th Lacy submitted a request not to be housed next to Larado. *Resp.* at ¶ 12.

Between October and December, Lacy maintains people were calling him a snitch every time he was around people not on PC. *Resp.* at ¶ 16. This is what prompted him to change him mind about wanting to remain on PC and also to request that he not be outside his cell with anyone not in PC. *Id.* After December 18th, Lacy states he was put on total segregation and not allowed to have a cell-mate or recreation with anyone. *Id.* at ¶ 21.

Lacy did not identify any of the inmates who harmed him on the morning of September 6, 2007. *Resp.* at ¶ 13. Prior to the initial altercation at approximately 9:10 a.m. on September 6, 2007, the defendants had no reason to believe Lacy was in any danger. *Id.* at ¶ 14. To his knowledge, Lacy was not in danger from the inmates in D-130 in particular. *Id.* at ¶ 15.

Lacy does not know the names of the inmates who attacked him the afternoon of September 6th. *Resp.* at ¶ 17. Because defendants did not move anyone out of D-130 following the attack on him in the morning, Lacy maintains "anyone would know it could happen again." *Id.* at ¶ 18. He states he was not moved until he got jumped the second time. *Id.* Furthermore, he states that was his first day in that pod. *Id.*

-6-

Lacy never personally spoke to, or communicated with, Sheriff Ferguson about his concerns for his safety. *Resp.* at ¶ 20. However, he believes Sheriff Ferguson had a duty to make sure the deputies were trained and the jail was being properly run. *Id.*

With respect to Captain Petray, Lacy states he does not believe he makes sure the deputies are properly trained. *Resp.* at ¶ 22. He notes that on December 8, 2008, Larado, who was not on PC was on recreation with him and also allowed to come into his cell. *Id.* Furthermore, Lacy states Captain Petray does not adequately address grievances. *Id.* By way of example, Lacy states Captain Petray responds "I'll check on this" in response to many grievances but never follows through. *Id.*

With respect to Deputy Hernandez, Lacy states he was in pod control on December 11, 2007, when Lacy was put on recreation with Laredo. *Resp.* at ¶ 23. Additionally, Lacy states Hernandez did not say anything when Laredo came into Lacy's cell and shut the door. *Id.*

With respect to Deputy Duncan, Lacy states he was in pod control when Laredo was in Lacy's cell and asked for the cell to be opened. *Resp.* at ¶ 24. Lacy asserts Duncan did nothing and said nothing. *Id.*

With respect to Deputy Bryson, Lacy asserts he did nothing to move him from D-130 after he got attacked the first time or to move anyone else from the pod. *Resp.* at ¶ 25. Lacy asserts Bryson acted like he was going to move Teas but then placed hm back into the pod. *Id.* Lacy states at the time Bryson was acting shift sergeant. *Id.*

With respect to Deputy Larkin, Lacy asserts he was in pod control when Laredo was in Lacy's cell and asked for the cell door to be opened. *Resp.* at ¶ 26. Lacy asserts Larkin did nothing and said nothing. *Id.*

-7-

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## III.  DISCUSSION

Defendants have now moved for summary judgment.  First, defendants contend there is no evidence that they failed to protect Lacy.  Second, they contend there is no evidence of an unconstitutional custom or policy of Benton County.  Finally, they maintain that Sheriff Ferguson and Captain Petray were not personally involved and there is no basis on which they can be held liable for the alleged actions of their employees.

-8-

AO72A
(Rev. 8/82)

Due process "'protects pretrial detainees both from deliberate exposure to violence and from failure to protect when prison officials learn of a strong likelihood that a prisoner will be assaulted.'" *Anderson v. Gutschenritter*, 836 F.2d 346, 349 (7th Cir. 1988)(*quoting Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir. 1984)).  Similarly, the Eighth Amendment imposes a duty on the part of prison officials to protect convicted prisoners from violence at the hands of other prisoners.  *See e.g., Perkins v. Grimes*, 161 F.3d 1127, 1129 (8th Cir. 1998).  In addressing failure to protect claims brought by pretrial detainees, the Eighth Circuit Court of Appeals has noted that pretrial detainees are entitled to at least as much protection as a convicted inmate and has applied Eighth Amendment analysis to claims brought both by pretrial detainees and convicted prisoners.  *See Perkins*, 161 F.3d at 1129- 1130.  *See also Crow v. Montgomery*, 403 F.3d 598, 600 (8th Cir. 2005)(analyzing a pretrial detainee's failure to protect claim under the same Eighth Amendment analysis used for similar claims brought by convicted prisoners); *Thomas v. Booker*, 784 F.2d 299 (8th Cir. 1986)(same).

In *Riley v. Olk-Long*, 282 F.3d 592 (8th Cir. 2002), the court stated:

An Eighth Amendment claim for failure to protect is comprised of two elements. First, an "inmate must show that [he] is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the inmate must establish that the defendant prison official recklessly disregarded that risk. *Jackson v. Everett,* 140 F.3d 1149, 1151 (8th Cir. 1998). "For the purposes of failure to protect claims, it does not matter ... whether a prisoner faces an excessive risk of attack for reasons personal to [him] or because all prisoners in [his] situation face such a risk." *Hott v. Hennepin County, Minn.,* 260 F.3d 901, 906 (8th Cir. 2001) (internal quotations omitted). The question is whether a prison official has a "sufficiently culpable state of mind," meaning that [he] is deliberately indifferent to an inmate's safety. *Farmer,* 511 U.S. at 834 (internal quotation omitted). The prison official's state of mind is measured by a subjective, rather than an objective, standard. *Id.* at 838-39; *see also Jackson,* 140 F.3d at 1152 ("[D]eliberate indifference must be viewed from [defendant's]

-9-

> perspective at the time in question, not with hindsight's perfect vision."). "[T]he
> official must both be aware of facts from which the inference could be drawn that
> a substantial risk of serious harm exists, and [he] must also draw the inference."
> *Farmer,* 511 U.S. at 837.

*Riley,* 282 F.3d at 595.  *See also Krein v. Norris*, 309 F.3d 487 (8th Cir. 2002)

Thus, to prevail on his failure to protect claim, Lacy must show:  (1) that his incarceration posed a substantial risk of serious harm, and (2) the defendants knew of and disregarded an excessive risk to Lacy's safety.  *Pagels v. Morrison*, 335 F.3d 736, 740 (8th Cir. 2003).

To establish the second component, Lacy must show that defendants acted, or failed to act, with deliberate indifference to Lacy's safety.  *Id.*  Negligence is not sufficient.  *Id.*  Even if the conduct was unreasonable, this is not enough because "reasonableness is a negligence standard."  *Id.* at 742  (internal quotation marks and citation omitted).  Further, the United States Court of Appeals for the Eighth Circuit has noted that "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Id.* at 740-741 (internal quotation marks and citation omitted).

In *Perkins v. Grimes*, 161 F.3d 1127 (8th Cir. 1998), the district court "agreed that defendants were on notice that Wilson was a disruptive inmate," but found defendants "had no notice that Wilson posed a threat of serious injury to Perkins because Perkins did not effectively alert them that he faced such a threat."  *Id.* at 1130.  Further, the district court found that "the defendants periodic cell checks yielded no information that would have put them on such notice."  *Id.*  The Eighth Circuit Court of Appeals found no clear error.  *Id.*  It noted that

-10-

"[a]lthough the testimony indicated that Wilson was an easily provoked detainee, the evidence also shows that Perkins and Wilson had previously been housed together without incident and that Perkins' jailers neither knew, or had reason to know, that Wilson was a violent sexual aggressor, either on this or on a previous occasion." *Id.*

In this case, Lacy maintains there were various occasions when the defendants failed to provide him with a safe environment. The first occasion was on September 6, 2007. Lacy was attacked at approximately 9:10 a.m., on September 6, 2007, but was placed back in the same pod by Deputy Hernandez and Deputy Bryson without his attacker being positively identified. Lacy, apparently on the mistaken belief his attacker had been identified as Mark Teas and was being moved by Deputy Bryson, stated he did not believe his life was in danger. Teas was then placed back in the same pod. With Teas back in the same pod, the population of the pod was the same as it was before the first attack on Lacy. Lacy was attacked a second time later that day.

Hernandez and Bryson knew Lacy had been attacked by someone in the pod. They knew Lacy could not identify his attacker. They knew the inmates had not divulged any information under interrogation. They did nothing to change the dynamic of the pod or ensure Lacy's protection. We believe this is sufficient to establish a genuine issue of material fact as to whether on September 6th Lacy was incarcerated under conditions posing a substantial risk of serious harm and as to whether Hernandez and Bryson recklessly disregarded the risk.

Beginning on October 15th, Lacy also maintains he asked many times to be moved out of cell 127 in pod E-102. In support Lacy notes he filed a number of grievances and requests

-11-

about being moved. *Defts' Ex.* 4 at pages 10-13, 16-17, 20-22.  He maintains he was in fear for his safety because his cell-mate, John Crawford, had mental problems. *See* (Doc. 31) at page 3 ¶ 12-14.  Lacy stated the cell-mate walked around talking and yelling at people who were not there. *Defts' Ex.* 4 at page 16.  Lacy feared they would get into a fight because Crawford yelled at him two or three times. *Id.*  When Crawford went off on someone, Lacy stated he did not want it to be him. *Id.*  Twice in response to his stated fears, Captain Petray asked if Crawford had threatened Lacy "directly." *Defts' Ex.* 4 at pages 13 & 16.  Lacy indicated it was a month before he was moved to a safer cell. (Doc. 31) at ¶ 15.  We believe there is a genuine issue of material fact as to whether Captain Petray exhibited deliberate indifference to a serious risk of harm to Lacy when he elected not to move Lacy and/or Crawford despite Lacy's repeated requests. *See e.g., Young v. Selk*, 508 F.3d 868, 873-74 (8th Cir. 2007)(inmate asked to be moved because cell-mate was "deranged," there was "something wrong" with him, and he had been threatened by him).

Finally, on December 8th Lacy put in a grievance asking not to be around any inmate not on PC because he had been threatened several times. *Defts' Ex.* 4 at page 31.  On December 11th, Lacy states he was put on recreation with Larado. *Resp.* at ¶ 23.  According to Lacy, Laredo was not on PC. *Resp.* at ¶ 11(D).  On December 13th, Lacy submitted a request not to be housed next to Larado. *Id.* at ¶ 12.  Lacy maintains Hernandez, Duncan, and Larkin were in pod control when Laredo was in Lacy's cell and asked for the cell to be opened. *Resp.* at ¶¶ 23, 25 & 26.  Lacy maintains the deputies did nothing and said nothing. *Id.*

-12-

We believe there is a genuine issue of material fact as to whether  Hernandez, Duncan, and Larkin acted with deliberate indifference to the safety of Lacy when they allowed Larado to be in Lacy's cell despite the fact that he was on PC and had told officials he had been threatened by Larado.  We think the information provided to the defendants was sufficient to support a finding that they were aware of a substantial risk of serious harm to Lacy.

However, Lacy points to no personal involvement on the part of Sheriff Ferguson.  *See Szabla v. City of Brooklyn Park*, 486 F.3d 385, 397 (8th Cir. 2007)(no *respondeat superior* liability under § 1983–no liability merely because official employs the individual who allegedly violated the plaintiff's constitutional rights); *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007)("[A] warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement.");  *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility).  Further, the record in this case is devoid of any suggestion of the existence of a custom or policy on which to hold Benton County liable.  *See Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)(holding that a plaintiff seeking to impose § 1983 liability on a municipality must show an official policy or a widespread custom or practice of unconstitutional conduct that caused the deprivation of the plaintiff's constitutional rights).  In short, there is nothing to suggest Lacy's alleged constitutional deprivation was caused by a custom or policy of Benton County.  See *e.g., Pietrafeso v. Lawrence County*, 452 F.3d 978, 982 (8th Cir. 2006)("A county is liable if an action or policy itself violated federal law, or if the

-13-

action or policy was lawful on its face but led an employee to violate a plaintiff's rights [and] was taken with 'deliberate indifference' as to its known or obvious consequences.")(internal quotation omitted)).

## IV.  CONCLUSION

I therefore recommend that the motion for summary judgment (Doc. 18) be granted in part and denied in part.  Specifically, I recommend that the plaintiff's claims against Sheriff Keith Ferguson be dismissed.  In all other respects, I recommend that the motion for summary judgment be denied.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 26th day of February 2009.

/s/ J. Marschewski
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-14-