IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


BRANDON EUGENE LACY                                          PLAINTIFF

     v.                            Civil No. 07-5200

CAPTAIN HUNTER PETRAY; ET AL.                               DEFENDANTS


**MEMORANDUM OPINION**

     Brandon Eugene Lacy (hereinafter Lacy) brings this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. While he was an inmate of the Benton County Detention Center, Lacy contends his constitutional rights were violated when he was incarcerated under conditions posing a substantial risk of serious harm. Specifically, on September 6, 2007, Lacy alleges he was attacked twice by fellow inmates. Following the first attack, Lacy maintains defendants should have taken steps to protect him. Additionally, although he was placed on protective custody following the second attack, Lacy maintains defendants continued to expose him to dangerous conditions including housing him with an inmate who was mentally ill and allowing inmates not on protective custody access to him.

     Pursuant to the consent of the parties (Doc. 51), a non-jury trial was held on September 22, 2009. At the conclusion of the trial, the case was taken under advisement pending preparation of this memorandum opinion.

**I. BACKGROUND**

     At the trial, the court heard the testimony of the following witnesses: (1) James Reeves (testimony taken telephonically); (2) Raymond Bryson; (3) Michael Finnegan; (4) Marsha Smith;

-1-

(5) Dana Larkin; (6) Hunter Petray; (7) Christine Nance; (8) Juan Hernandez; (9) David Duncan; (10) Doug Sillivan; (11) Bobby Watkins; (12) Keonna Williams; (13) Kitty Barnhill; (14) Virginia Lacy; and (15) Brandon Lacy.

The first incident at issue in this case occurred at approximately 9:10 a.m. on September 6, 2007, when Deputy James Reeves and Deputy Jose Hernandez saw, among other things, Lacy getting up off the ground.  The second incident occurred at approximately 4:50 p.m. when Deputy Michael Finnegan heard the inmates getting loud and beginning to cheer.  Finnegan reported he stepped into the cell and saw Lacy getting punched by a fellow inmate.  When Lacy returned from the hospital after the second attack, he was initially placed in a medical cell in the booking area.  Once out of the medical cell, he was placed in protective custody.  For purposes of discussion, the testimony of the witnesses will be summarized in the first person.

### James Reeves

In 2007 I was a correctional officer in Benton County, Arkansas.  I worked at the Benton County Detention Center (BCDC) about seven months prior to the incident.

I have the incident report with me.  *See Plaintiff's Exhibit* (hereinafter *Pllf's Ex.*) 3. Hernandez witnessed what appeared to be Inmate Teas kick Lacy.  Ninety-five percent of the time when there is an altercation between inmates they know who did it.  However, the majority of the time they don't reveal who jumped them.  If the inmate doesn't cooperate and reveal who jumped them, the inmate is put back in the pod.

If there is a fight between two individuals, depending on the severity, one of the individuals is moved somewhere else.  If there is not room to move the inmates, then we have the option of locking the inmates down within the cell block.

-2-

I didn't make the call to put Lacy back in the pod. *Plff's Ex.* 3. I wasn't in charge. I had briefed Bryson on what occurred and he was assessing what happened. I seriously doubt Lacy would have been moved given the overcrowding at the jail at the time.

From what I recall, at that time we were at maximum capacity. We were having problems moving people. Protective custody (PC) is in a completely different wing. The shift manager working in the pod would first have to see if there was room in PC and then the person in charge, Captain Petray, would have to approve the move.

I don't know if Bryson knew who Teas was. Lacy said he panicked and grabbed the closest thing which was Teas' leg. Teas shook him off. Teas told Bryson he shook Lacy off his leg.

I didn't see any of this. It is difficult to see from pod control.

No one other than Lacy said he had been punched. Lacy didn't have a black eye or anything.

Lacy couldn't identify without a reasonable doubt who kicked him in the face. Usually if inmates plan something they also plan a diversion.

I didn't have any reason to doubt Teas. It does seem implausible that Lacy would just fall off the stool. At the time the jail was at maximum capacity. Lacy was not being truthful. We had no choice but to put him back in the pod.

I was not aware of any threats being made. I don't recall there being any threats to Lacy's safety. If there had been any danger to Lacy's safety or life, I would have noted it in the report. *See Plff's Ex.* 3.

-3-

I was not there when Teas was being questioned by Bryson. When Bryson was questioning Teas, I was back in the pod. I can't recall if I saw Bryson walking Teas anywhere.

### Raymond Bryson

I'm a former employee of the Benton County Sheriff's Office. I was the shift sergeant on the day of the incident involving Lacy. I was in charge of the shift for the entire jail. I worked the day shift from 7 a.m. to 5 p.m.

I made the call to put Lacy and Teas back into the same cell block, D130. *Plff's Ex.* 4. I didn't see any evidence of there having been an altercation. There were no signs of Lacy having been punched. I would have noted that in my report.

I asked Lacy if he needed medical attention. He said no.

I asked Lacy if he thought he was in danger. He replied no.

Lacy couldn't tell me what happened. Everybody was questioned.

It is a risk being inside the jail. I asked Lacy if he feared for his safety. I asked him if he had any problems with any other inmates because he had said he didn't have any problems with Teas. I questioned everybody and got the information for myself. I questioned several inmates. No one said Lacy was punched. The only physical contact reported was Lacy grabbing Teas' leg.

I don't recall Inmate Bretado. He wasn't on the radar at this point.

I know we were at full capacity for D pod. This would have been a couple of hundred inmates--200 to 250 inmates would be my guess at that time.

-4-

When two inmates are fighting, we separate and question them. We then put them both in lock down in separate locations. I didn't see the altercation that day. There was no evidence of an altercation involving Lacy. We didn't know what happened. The inmates didn't cooperate.

The information I got was that Lacy grabbed Teas' leg. Teas then either tried to help Lacy up or push him off.

I don't recall Hernandez saying he saw an inmate kick Lacy in the face. We would have to identify the inmate by questioning more inmates. Lacy said he didn't feel his life was in danger.

I wrote my report at the end of shift when I had time. I don't recall if I had a pod I could have moved Lacy to. Lt. Carter was informed that day. He signed off on my report. *Plff's Ex.* 4. Captain Petray was informed but I'm not sure when. It was probably the next day when he found out about the later incident.

I was terminated from the jail. The termination had nothing to do with this incident. It had nothing to do with writing reports.

### *Michael Finnegan*

I'm a detention deputy. On September 6, 2007, I had been working at the detention center five days. My shift began at 3 p.m. There is a briefing at the beginning of the shift. We are told what happened during the previous shift. Bryson does the briefing. There was no mention of a fight involving Lacy.

There are six pods in D block. There are thirty-two cells in D-130. Each cell has two bunks. There were sixty-four people in the pod that day.

-5-

I was doing cell searches when I saw Inmate Bretado-Patino hit Lacy. *See Plff's Ex.* 2. Lacy threw an unsuccessful punch back. The two were in an open area of the pod near a table squared off. A third unidentified inmate came from behind and seemed to be on Lacy's side in the fight. The third inmate threw a punch at Bretado. I did not see who started the fight.

I escorted Lacy to pod control and asked him his reason for fighting. Lacy replied: "It was me, I did it." I wrote Lacy up. He threw a punch. This was a sign of a fight.

I called for assistance over the radio. Both Lacy and Bretado were locked down. Bretado was taken to E pod. I didn't know about the morning incident until a few weeks ago.

Prior to the altercation, there was no reason to believe Bretado was a threat. Lacy was still standing after Bretado hit him. Lacy fell after he threw a punch. When Lacy was in pod control, he looked like he was in extreme discomfort. He was hunched over and pulling at his chest on the right side.

I got off at 1 a.m. I wrote the report at 2205 or 10:05 p.m. This was the first opportunity I had to get to a computer to do the report. I mentioned the incident at briefing.

### *Marsha Smith*

I'm a nurse employed at the Benton County Jail. The first page of plaintiff's exhibit 5 is part of Lacy's jail file. The second page of plaintiff's exhibit 5 is a record from when Lacy was taken to the emergency room at St. Mary's Hospital.

Lacy was brought to the nurse's station on September 6th. He said he had gotten jumped for a second time that day. I noted his left eye was black. Lacy said he had been hit in the eye in the morning and again just now.

-6-

He complained his right shoulder was hurting.  He had a bone protruding at the clavicle area and a knot on his shoulder.  He appeared to have a broken clavicle.  The treatment is to immobilize it.  I sent him to the emergency room.

At the hospital, x-rays were taken of his right shoulder.  He was given a clavicle strap and told to use it for four weeks.  He was given Tylenol for pain, 500 mg. as needed.

On September 7th he was seen by the jail doctor.  The doctor checked his right shoulder and left eye but did not prescribe any additional medication or any additional treatment.  *Plff's Ex.* 5 at page 1.

On September 11th the Tylenol was continued for an additional five days.  *Plff's Ex.* 5 at page 1.  On September 12th, the doctor adjusted the strap and gave Lacy permission to take the strap off for one-half hour each day.  *Id.*

### Dana Larkin

I'm a deputy with the Benton County Sheriff's Department.  I was employed in that capacity on September 6, 2007.

If an inmate is in a cast or a sling, they are housed in a medical cell in booking.  *See e.g., Plff's Ex.* 6.  All six inmates listed on my report dated September 12th, were housed in the one medical cell.  *Id.*  To my knowledge, Lacy didn't raise any complaints about the inmates he was housed with.  *Id.*

If an inmate is in PC, they are usually housed in administrative segregation E-102. Plaintiff's exhibit 9 shows the time people came out on recreation.

### Hunter Petray

-7-

I'm a captain at the Benton County Sheriff's Office.  On September 6, 2007, I was probably made aware of the first incident involving Lacy after the fact.  Bryson was authorized to move someone if he believed the inmate was in danger of attack.  Individual jailers were not authorized to move inmates.  Bryson would have briefed Lt. Carter.

I probably became aware of both incidents on September 7th.  Lt. Carter filled out the PC custody report.  Lacy was in a sling in the medical cell up in booking initially.  There were two incidents in one day.  Nothing in the investigations lead us to believe there was a conspiracy to attack Lacy.  Lacy probably stayed in the medical cell until the sling came off and then was moved to PC.

It is not unusual for a report to be prepared a number of hours after an incident occurs.  The report is prepared when the officer gets a break or at the end of the shift.  Sometimes the deputies keep a pocket notebook.  Sometimes a deputy does the report from memory.

PC inmates are housed separately.  E-102 is the PC cell block.  When they are taken somewhere within the detention center, they are escorted everywhere.  However, if the PC inmates are doing recreation inside the pod they are not escorted because there is a deputy standing there.  PC inmates do visitation in the booking area.  Lacy wanted to have it both ways.  He wanted to be on PC but also wanted to have a roommate and be a trustee.

On September 29th Lacy submitted a request asking why he could not have recreation with anyone else in his pod or go to church with the rest of them.  *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 3 at page 1.  He wanted to know what he did wrong to be by himself twenty-four hours a day.  *Id.*

-8-

From this request it appeared Lacy wanted to be taken off PC. However, I felt it was in his own best interests and in the best interests of the Sheriff's Office for him to remain on PC.

On October 3rd Lacy submitted another grievance asking why he was in a cell by himself, went to recreation by himself, and to church by himself. *Defts' Ex.* 3 at page 2. This grievance was submitted before Lacy was housed with Crawford.

On October 15th Lacy submitted a grievance stating he wanted to be taken off PC to become a trustee. *Defts' Ex.* 3 at page 3. This would put Lacy around others. Trustees are around all inmates at different times. There is always a deputy with a trustee.

I don't know how it transpired but Lacy did have a roommate after a period of time. He was still in E-102 in protective custody. Plaintiff's exhibit 7 are grievances Lacy submitted and I responded to. In the grievances dated October 20th to November 10th Lacy complained about his cell-mate John Crawford and his behavior. Lacy had an issue with him. In response to the first two grievances I asked Lacy if Crawford had threatened him directly in anyway. In response to the third grievance I said I would see what I could do.

To my knowledge Crawford never attacked anyone in the BCDC. We do not have a padded cell but if an inmate is mentally incompetent we try to keep them isolated.

We have inmates who want to move all the time. That is why I asked for specifics. I don't think he ever harmed Lacy. I never went down and talked to Lacy.

Plaintiff's exhibit 8 are requests Lacy submitted about Crawford. I did not respond to these.

Both Lacy and Crawford were charged with murder.  We try to put people with equal charges together.  I assumed Lacy would respond to me with specifics of the threats Crawford made towards him.  Lacy filed grievances daily.  I was waiting on a response from Lacy.

Lacy submitted eight separate requests and grievances about Crawford between 10/20/07 and 11/12/07.  *See Plff's Ex.* 7 & *Plff's Ex.* 8.  We probably moved Lacy or Crawford or one of them got released.  I think we probably moved Crawford because we just got tired of seeing the grievances and requests from Lacy.

I believe Crawford was convicted of murder and sent to the state hospital.  I don't know if he was found not guilty by reason of insanity.

To my knowledge the county paid for Lacy's medical bills associated with his medical visit on September 6th.  Lacy submitted two hundred grievances in the months he was at the detention center.  None of these said anything about him fearing for his safety from Bretado or fearing for his safety at all prior to September 6th.

An inmate is put on administrative segregation when he doesn't get along in the jail.  An inmate is put on PC when there is a reason to fear for the inmate's safety.  Lacy was not punished He received visitation and phone calls.

### Christine Nance

I work for the Benton County Sheriff's Office.  Plaintiff's exhibit 9 is part of the log book for December 11, 2007.  PC are only protected from certain people.  It looks like Lacy had recreation with  Crawford and Jose Laredo.  *Plff's Ex.* 9.  We try to keep the E-102 visitation separate.  There are four pods in E-102.  If the inmates are on PC, we sometimes take them to recreation in the booking area.

-10-

Lacy and Crawford were housed in the same cell.  I didn't observe any issues between them.  I didn't know there was any issue between Lacy and Laredo.  Just because my name is on the log book doesn't mean I am the one who gave the inmates recreation that day.

**Juan Hernandez**

I work for the Benton County Sheriff's Office.  I am now a field deputy.  In 2007 I worked in the jail.

I vaguely recall the incident on September 6th.  It might have looked like the other inmate kicked Lacy from the position I was in; or Lacy may have grabbed his leg.  I was outside the control room looking into the pod.  The inmates were scattered around.  Lacy was on the floor holding onto someone's foot.  Either he had been kicked or was grabbing hold of it.  I didn't have any discussion with them.

I called both inmates out to pod control.  There was no sign that Lacy had been punched in the face.  Lacy said someone sucker punched him.

I remember calling Bryson at the time and relaying to him as much as I could.  I remember Bryson asking Lacy if he feared for his life.  He said no.  I didn't hear Bryson ask who punched him or if he had any problems with the inmates.  I knew what Lacy was incarcerated for.

I might have written  a report.  I read Reeves' report.  *Plff's Ex.* 3.  I don't recall telling Reeves that Lacy was being kicked in the face.  Lacy was on the floor and Teas was shaking his leg.  I never saw Teas' leg strike Lacy in the face.  Reeves got it incorrect in the report.  I told Bryson what I said here today.  I didn't see any injury to Lacy's face.

-11-

It was not my decision to remove someone from the cell.  It seemed like Lacy wasn't afraid by the way he said it.

I was working on December 11th.  *Plff's Ex.* 9.  I don't recall a note to keep Lacy separate from Laredo.  Laredo was never rowdy with me.  I don't recall him going in Lacy's cell or pushing the cell button and asking to be let out.

### David Duncan

I work for the Benton County Sheriff's Department.  I was working on December 11, 2007.  *Plff's Ex.* 9.

E-102 was given recreation.  I cannot recall seeing Laredo go into Lacy's cell.  I don't remember.  A lot of times people on recreation go back to their cells to use the restroom.

Lacy and Crawford were in the same cell together.  There were times there were three inmates per cell.  I honestly don't know if Laredo was housed in the same cell.  Just because all three had recreation at 9:54 doesn't mean all three were in the same cell.

### Doug Sillivan

I'm an inmate in the Arkansas Department of Correction (ADC).  I'm housed at the Varner Unit.  I was convicted of rape.

I was incarcerated at the BCDC for twelve and one-half months in E-102.  I was housed with Lacy in PC/Administrative Segregation and in the medical cell.  I was in PC because I was charged with the rape of a child.  I was hit by another inmate while in the general population.  I was moved to E-102.  It didn't happen again.

-12-

People not on PC were allowed to be around inmates on PC on numerous occasions.  I saw Lacy singled out by deputies and given a hard time.  Different deputies would do this.  I can't think of the names of any deputies right off.

I felt unsafe on PC.  I never saw Lacy being assaulted.  I didn't know who Lacy was being protected from.  I knew he was in a fight in September of 2007.

### Bobby Watkins

I'm an inmate in the ADC.  I was incarcerated at the BCDC for ten and one-half or eleven months.  I was housed in E-102 with Lacy.

Lacy was housed uncomfortably.  Sometimes he was housed by himself.  He was denied visitors, haircuts, etc., and given a hard time by deputies.

We were around inmates who were not on PC.  It just depended on what officers were at the door.  It was not safe.

I wrote grievances.  All responses said the same thing.  They didn't care.  Petray always put:  "I will check into it."

I'm suing now.  Lacy hasn't agreed to be a witness.  I haven't asked him.

### Keonna Williams

I'm in the ADC.  I'm housed in the Tucker Unit in the general population.  I'm a pre-operation transsexual.

I was in the BCDC for ten months.  I was in E-102 with Lacy.

I was in administrative segregation.  I wanted out of administrative segregation to go in the general population.  Petray wouldn't allow it.

-13-

I remember Crawford.  He had mental health problems.  He talked to himself and would sing loudly and scream.  It was hard to be in a cell with him.

I never saw Crawford strike anyone.  I did see him bang on tables and walls.

I heard Laredo threaten Lacy.  Laredo spoke in broken English--half English and half Spanish.  He would point, yell, and scream.  I didn't see him strike Lacy or anyone but he would point and threaten.

Anybody on first shift could have seen him threaten Lacy.  He singled people out.  Lacy was one of them.  I saw him go to Lacy's cell and shut the door.

Administrative segregation came out by themselves.  PC came out with others.

Administrative segregation was like punishment.  If you did something and you were locked down, a lot of your personal freedoms were taken away.

I saw deputies giving Lacy a hard time.  Lacy wrote a grievance to Petray.  Lacy was told he would remain where he was at.  Petray answered all grievances the same.  Petray told me if you don't like what I'm doing sue me.

I never saw Lacy being assaulted by another individual.  Recreation was usually in an open area of the day room.

### Kitty Barnhill

I'm Lacy's Mother.  I visited him several times at the BCDC.

The first time I visited him was in booking.  It was in a secluded area.

The second time was in E pod.  There were a lot of other inmates there like a general population area.  Most of the time my visits with him were up in the booking area.

-14-

I saw Lacy with a black eye and a broken collar bone.  I didn't see a deputy escort Lacy up into that room.  I got the impression that the deputies thought Lacy was a problem.

**Virginia Lacy**

I'm Lacy's Grandmother.  I visited him at the BCDC at least once a week.  One time I didn't get to see him because they said he was on lock-down.

The visits occurred in different areas.  The first place I visited him was in the booking area.  There is glass between and you talk on the phone.

I saw him with a black eye and his arm in a sling.  He didn't say who beat him up.

The second place I visited him was in E pod.  There is one guard in his own glass area and a bunch of people around.  It didn't look like Lacy was in PC.

I saw Petray give him odd looks and sneaky looks.  I believe it was because of Lacy's charges.

**Brandon Lacy**

I'm an inmate at the ADC, Varner Unit.  The first incident occurred on September 6th.  It was one of my first days in the BCDC.  I turned myself in on September 3rd.

I had my head down and was reading a newspaper.  Someone hit me from the front.  I fell backwards and my shoes fell off.  Out of instinct, I grabbed the first person I could.  It happened to be Teas.

Bryson insinuated that I was holding back information.  I didn't know who hit me.  I didn't think I needed medical attention.  I heard Bryson tell Teas he was taking him to the hole.  I saw him walking Teas off .  For that, I understood Bryson was moving Teas and he was the one who did it.

-15-

I was told to go back into the pod.  The inmates started looking at me differently.  I didn't feel threatened.  Ten minutes later, Teas was put back in there.

There was probably no way the deputies could have known I was going to get hit prior to the first incident happening.  I was new to the pod.  I had been in the paper for three days.  The insinuation was made that I had snitched on my co-defendant, Broderick Laswell.  I asked my cell-mate what was going on.

They put me back in the pod and said here fend for yourself.  I was kind of worried during the day but what could I do.  They were going to do anything.

The second incident occurred later in the day.  Before the second incident I was walking around the pod near the bathroom.  I got hit once in the back of the head and went to the ground.  Then there were a bunch of hits and kicking.

When the deputy came in, I was in a ball on the floor.  I don't know who Bretado is.  I couldn't pick him out of a line up.

I may have thrown a punch.  I don't remember swinging a punch.  If I did, it was a reflex.  When I said:  "Its me, I did it," I meant I was the one who was hurt.  I saw the nurse and was taken to the hospital.

I first looked in a mirror at the hospital after the second incident.  My eye was red and hurting.  The guards would have seen that.

When I got back from the hospital, I was put in the medical cell.  When I got out of the medical cell, I was put in E-102.  The first cell-mate I had was a Hispanic guy.  Then I was in a cell with Crawford.  He would go around yelling and talking and cussing people.  He was mental.  We were locked in the cell twenty-three hours a day.

-16-

I would wake up and he would be there staring in my face.  A couple of times he said: "You, I will get you."  I told him, calm down, etc.  He would go off.  I asked for two months to be moved or for him to be moved.  I was getting worn down.

I worried about what he would do to me.  He was moved out.  Then I had no problems with my cell mates.

I had problems with Laredo.  I didn't specifically put his name on the grievances.  I just put that he was Hispanic.  I didn't want him to think I was snitching on him.  I wasn't used to the code of silence.  You are supposed to allow yourself to get beat up and deal with it later.

Talking to a deputy didn't help.  So I put in a grievance.  I got along with everyone on PC.

The day after I wrote a grievance about an inmate threatening me, Laredo came into my cell.  I asked them to separate our cells.  My problem was my co-defendant was in the jail and running his mouth about me being a snitch.

I was around other inmates so much.  I was getting threatened here and there.  They just left me around inmates not on PC without regard to my PC status.  I believe a lot of it was because of my grievance.  I believe it was retaliation.

## II.  DISCUSSION

At the time the physical attacks occurred against Lacy, he was a pretrial detainee.  Due process "'protects pretrial detainees both from deliberate exposure to violence and from failure to protect when prison officials learn of a strong likelihood that a prisoner will be assaulted.'" *Anderson v. Gutschenritter*, 836 F.2d 346, 349 (7th Cir. 1988)(*quoting Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir. 1984)).  Similarly, the Eighth Amendment imposes a duty on the part of

-17-

prison officials to protect convicted prisoners from violence at the hands of other prisoners.  *See e.g., Perkins v. Grimes*, 161 F.3d 1127, 1129 (8th Cir. 1998).  In addressing failure to protect claims brought by pretrial detainees, the Eighth Circuit Court of Appeals has noted that pretrial detainees are entitled to at least as much protection as a convicted inmate and has applied Eighth Amendment analysis to claims brought both by pretrial detainees and convicted prisoners.  *See Perkins*, 161 F.3d at 1129- 1130.   *See also Crow v. Montgomery*, 403 F.3d 598, 600 (8th Cir. 2005)(analyzing a pretrial detainee's failure to protect claim under the  same Eighth Amendment analysis used for similar claims brought by convicted prisoners); *Thomas v. Booker*, 784 F.2d 299 (8th Cir. 1986)(same).

In *Norman v. Schuetzle*, ___ F.3d ___, 2009 WL 3713974, *4 (8th Cir. Nov. 9, 2009), the court said:

> In a prisoner Eighth Amendment claim, the "prisoner must satisfy two requirements, one objective and one subjective. The first requirement tests whether, viewed objectively, the deprivation of rights was sufficiently serious. The second requirement is subjective and requires that the inmate prove that the prison officials had a 'sufficiently culpable state of mind.' " *Irving,* 519 F.3d at 446 (quoting *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970) (internal citation omitted). In a claim involving an assault by one inmate on another, the subjective component asks whether the prison official was deliberately indifferent to a serious risk of an attack on the inmate. *Id.* The subjective component requires that the official was both " 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and he must also draw the inference.' " *Pagels v. Morrison,* 335 F.3d 736, 740 (8th Cir.2003) (quoting *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970). Negligence on the part of the prison official is insufficient to satisfy the subjective component; the official must recklessly disregard a known, excessive risk of serious harm to the inmate. *Id.*

*Id.*

In this case, the evidence clearly establishes, and in fact Lacy concedes, none of the defendants had reason to believe he was in danger of attack by other inmates prior to the first

-18-

incident the morning of September 6th.   Following the first incident, Lacy, Teas, and other inmates were questioned.  Lacy maintained he had been "sucker punched" but could not identify the individual involved.  Lacy did not identify Teas as the attacker instead only saying he had grabbed onto Teas' leg as he went down.

The testimony was uncontroverted that individual deputies could not make the decision whether to move inmates.  Instead, Bryson made the decision whether Lacy and/or Teas should be returned to the pod or moved.  When Bryson questioned Lacy, he indicated he did not have problems with the other inmates and did not feel he was in danger.  Given the result of Bryson's investigation and Lacy's responses to Bryson's questions, we cannot say Bryson disregarded a known excessive risk of serious harm to Lacy when he made the decision to return both Lacy and Teas to the cell block.

With respect to the housing of Crawford with Lacy, Lacy presented evidence that Crawford was a difficult cell-mate and may have suffered from mental illness resulting in his talking to people who were not there, acting out by yelling and walking around a lot, and uttering threats.  However, the record is devoid of any evidence of violent tendencies on Crawford's part during the time Lacy and Crawford were housed together or during Crawford's incarceration at the BCDC.  *See Young v. Selk*, 508 F.3d 868 (8th Cir. 2007)(Young and Whitefeather shared a cell less than two days before the incident.  Young reported not only that he had been threatened, but he used words such as urgent and emergency to describe his circumstances and stated he needed to be moved immediately).   We therefore believe the several week delay in moving Crawford from the cell did not demonstrate deliberate indifference to Lacy's safety.  *See Perkins v. Grimes*, 161 F.3d 1127 (8th Cir. 1998)("[a]lthough the testimony indicated that Wilson was

-19-

an easily provoked detainee, the evidence also shows that Perkins and Wilson had previously been housed together without incident and that Perkins' jailers neither knew, or had reason to know, that Wilson was a violent sexual aggressor, either on this or on a previous occasion." ).

Finally, Lacy maintains that while he was on PC inmates who were not on PC, including Laredo, were allowed to be around him.  In this regard, we first note that Lacy submitted requests and grievances while on PC complaining that he was being forced to go to recreation and church by himself.  *See Defts' Ex.* 3.  He asked to be allowed to go with the rest of the inmates in his pod.  *Id.*  On October 15th he asked to be taken off PC.  *Id.* at page 3.

Then in December when he submitted requests and/or grievances indicating he feared for his safety while on PC, he did not identify Laredo or any other inmate by name.  Instead, on December 3rd and December 8th, Lacy submitted requests asking that he not be out of the cell with people not on PC.  *Plff's Ex.* 10 at page 1-2.  In a grievance submitted on December 12th, for the first time he mentioned Jose Laredo by name.  *Id.* at page 3. Lacy also states that at recreation the day before both Laredo's cell door and his were opened at the same time.  *Id.* at page 3.  In response, he was told the cells were not opened at the same time.  *Id.*

As noted above, to establish the second component, Lacy must show that defendants acted, or failed to act, with deliberate indifference to Lacy's safety.  *Pagels v. Morrison*, 335 F.3d 736, 740 (8th Cir. 2003).  Negligence is not sufficient.  *Id.*  Even if the conduct was unreasonable, this is not enough because "reasonableness is a negligence standard."  *Id.* at 742 (internal quotation marks and citation omitted).  Further, the United States Court of Appeals for the Eighth Circuit has noted that "threats between inmates are common and do not, under all

-20-

circumstances, serve to impute actual knowledge of a substantial risk of harm." *Id.* at 740-741 (internal quotation marks and citation omitted).

Although Lacy testified that Laredo was allowed into Lacy's cell on December 11th when they were on recreation together, we note that the requests he submitted on December 12th and December 13th, *plff's ex.* at pages 2-4, do not mention this occurring. The requests, in particular the December 13th one, are quite lengthy and request that Lacy's and Laredo's doors not be opened at the same time again. Lacy asks that he be moved to another cell so that he not be next to Laredo. However, there is not a single mention of Laredo having been in Lacy's cell. We therefore find this portion of Lacy's testimony not credible.

Having considered all the testimony and exhibits presented we conclude Lacy has failed to show that defendants acted, or failed to act, with deliberate indifference to his safety. Lacy was on PC. When he was moved throughout the detention center, he was escorted. When he was on recreation, a deputy was present or observed. Quite simply, the evidence presented was insufficient to establish that defendants acted with deliberate indifferent to a substantial risk of serious harm to Lacy.

### III.  CONCLUSION

For the reasons stated, judgment in favor of the defendants will be entered.

DATED this 23rd day of November 2009.

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)